387 S.E.2d 282

Otis J. VEST and Pauline
B. Vest, his Wife

v.

ST. ALBANS PSYCHIATRIC
HOSPITAL, INC., a Virginia
Corporation.

No. 18709.

Supreme Court of Appeals of
West Virginia.

Oct. 19, 1989.

Dissenting Opinion Nov. 21, 1989.

Richard E. Hardison, Beckley, for Otis J. Vest and Pauline B. Vest.

John R. Jessee and Frank K. Friedman, Woods, Rogers & Haxlegrove, Roanoke, Va., for St. Albans Psychiatric Hosp., Inc.

NEELY, Justice:

The appellants, Otis and Pauline Vest, citizens of West Virginia, brought this action in the circuit court of Raleigh County, West Virginia, charging the defendant, a Virginia corporation, with medical malpractice occurring in the Commonwealth of Virginia.[1] The action was dismissed because the appellants failed to comply with a no-

---

1. We assume for purposes of this appeal that West Virginia has personal jurisdiction over the defendant.

tice provision of Virginia's statute on medical malpractice review panels.

Otis Vest, a resident of Beckley, West Virginia, suffers from Parkinson's disease. In April 1984, he went to St. Albans Mental Health Services in Beckley for an adjustment of his medication for the disease. St. Albans, Beckley, is a West Virginia corporation offering outpatient services. Patients needing hospitalization are referred to St. Albans Psychiatric Hospital in Radford, Virginia, a Virginia corporation licensed to do business in West Virginia. Mr. Vest was referred to St. Albans, Radford, and was hospitalized there from May to September 1984. His condition worsened there, so that, appellants claim, Mr. Vest was "on the verge of death" at the time he was released from the hospital. Appellants claim that negligent treatment by St. Albans, Radford, and its staff caused the deterioration in Mr. Vest's condition.

On 18 September 1986, the appellants brought this action in the Circuit Court of Raleigh County, West Virginia. Mr. Vest sought damages based on the alleged negligence, and Mrs. Vest brought a derivative claim for loss of consortium. The appellants did not notify St. Albans, Radford, before filing this lawsuit.

The Virginia legislature has established a system of medical malpractice review panels that are available to either party in a potential medical-malpractice lawsuit. *Va. Code,* 8.01–581.1 *et seq.* [1984]. A plaintiff may not bring suit against a "health-care provider" registered in Virginia without first notifying the defendant of the claim and allowing time for the case to be reviewed by a medical review panel. Such panels are convened, case-by-case, by appointment of the Chief Justice of Virginia, at the request of either party. The panel comprises one trial-court judge (as chairman), three impartial Virginia lawyers, and three impartial Virginia doctors. The panel hears evidence and issues a non-binding opinion on the issues of liability and extent of injury. The panel's opinion is admissible as evidence if the matter goes to a full civil trial.

The Circuit Court granted the appellee's motion to dismiss the action, on the ground that the appellants had failed to notify the appellee before filing suit, as required by *Va. Code,* 8.01–581.2(A) [1984].[2] The appellants seek relief here, on the ground that the notice provisions of the Virginia statute are procedural only, not substantive law, and cannot be applied to bar their action in a West Virginia court.

■ We now reverse the judgment below, and hold that, in a West Virginia court, a citizen of West Virginia suing a Virginia hospital for injuries sustained in Virginia need not comply with the medical review panel provisions of Virginia law.

## I.

■ At first blush, the issue may appear to be a question of "choice of law" or "conflict of laws." In tort cases, West Virginia courts apply the traditional choice-of-law rule, *lex loci delicti;* that is, the substantive rights between the parties are determined by the law of the place of injury. *Paul v. National Life,* 177 W.Va. 427, 352 S.E.2d 550 (1986). There is no dispute that the substantive law to be applied in this case is the law of Virginia. It is just as clear that West Virginia procedure applies in all cases before West Virginia state

2. *Va. Code,* 8.01–581.2(A) [1984], provides:
No action may be brought for malpractice against a health care provider unless the claimant notifies such health care provider in writing by registered or certified mail prior to commencing the action. The written notification shall include the time of the alleged malpractice and a reasonable description of the act or acts of malpractice. The claimant or health care provider may be within sixty days of such notification file a written request for a review by a medical malpractice review panel established as provided in § 8.01–581.3. The request for review shall be mailed to the Chief Justice of the Supreme Court of Virginia. Upon receipt of such request, the Chief Justice shall designate one sitting or one retired circuit court judge to act as chairman of the panel. No actions based on alleged malpractice shall be brought within ninety days of the notification by the claimant to the health care provider and if a panel is requested within the period of review by the medical review panel.

courts, and a merely procedural rule of Virginia law would be ignored here.

A leading commentator on conflict of laws writes:

[One] type of rule often called procedural actually is designed to govern access to courts, and necessarily governs access only to courts of the state having the rule. A state can control access to its own courts but it cannot prevent courts of another state, if they have jurisdiction, from proceeding to exercise it.

R. Leflar, *American Conflicts Law*, 243–44 (3d ed. 1977). *See also Crider v. Zurich Insurance Co.*, 380 U.S. 39, 85 S.Ct. 769, 13 L.Ed.2d 641 (1965) (Federal court in Alabama may hear action based on Georgia worker's compensation act, even though Georgia limits enforcement to its own administrative board; the Court found it compelling that the worker was an Alabama resident, injured in Alabama, merely employed by a Georgia corporation).

The *Erie* doctrine has forced the federal courts to become adept at distinguishing between the substantive law and the procedural law of their forum states. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The federal courts of Virginia have held that, for purposes of the *Erie* doctrine, the notice provision of Virginia's medical review panel statute is substantive law. *DiAntonio v. Northampton–Accomack Memorial Hospital*, 628 F.2d 287 (4th Cir.1980). The plaintiff in *DiAntonio*, a New Jersey citizen, filed an action against the defendant, a Virginia hospital, in the federal court of the Eastern District of Virginia. The plaintiff had failed to notify the defendant before filing suit, as required by *Va.Code*, 8.01–581.2 [1977]. The Fourth Circuit held that the action had properly been dismissed, because, for purposes of the *Erie* doctrine, the statute was substantive:

The Act's notice requirement and provision for panel review at the instance of either party were so "intimately bound up" with the rights and obligations being asserted as to require their application in federal courts under the doctrine of *Erie Railroad Co. v. Tompkins*, [*supra*].

*Id.* at 290.

We do not in the least disagree with the holding in *DiAntonio*.[3] We part ways with the Fourth Circuit in this case not on the grounds of technical choice-of-law rules, but on the connection among sovereignty, *in personam* jurisdiction, and access to the courts of sister states.

Our Federalism comprises two distinct and complementary strands: The national government's relation to the states, controlled by the Supremacy Clause of the U.S. *Constitution* and, in the *DiAntonio* example, by the *Erie* doctrine; and the relation of the government of one state to the governments of her sister states, controlled by the Full Faith and Credit Clause and the Privileges and Immunities Clause of the U.S. *Constitution*, the principle of comity, and, in this particular case, the doctrine of *in personam* jurisdiction.

A court is always the court of a sovereign. Before the decision in *Erie*, the federal courts saw their sovereign as the United States alone. Even in diversity cases, federal courts imagined that the law that governed between the parties was the law of the United States. In *David Lupton's Sons Co. v. Automobile Club of America*, 225 U.S. 489, 32 S.Ct. 711, 56 L.Ed. 1177 (1912), the plaintiff brought a contract claim in the federal court in New York because New York barred access to its state courts by foreign corporations not registered to do business in New York. The Court held:

The state could not prescribe the qualifications of suitors in the courts of the

---

3. We doubt that a federal court in New Jersey would have required DiAntonio to undergo the medical review process in Virginia before bringing an action in the *New Jersey* federal system. The *Erie* doctrine would have applied in that instance, but a federal court in New Jersey would apply the substantive law (including the conflict-of-law rules), of the *forum* state, New

Jersey. Even though the substantive law applied there would likely be Virginia's, the New Jersey conflict-of-law rules would probably treat the Virginia notice provision the same way this Court does. *See generally*, Note, "The Confrontation Between State Compulsory Medical Malpractice Screening Statutes and Federal Diversity Jurisdiction," [1980] *Duke L.J.* 546.

United States, and could not deprive of their privileges those who were entitled under the Constitution and laws of the United States to resort to the Federal courts for the enforcement of a valid contract.

*Id.* at 500, 32 S.Ct. at 714; *contra,* after *Erie, Woods v. Interstate Realty Co.,* 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949).

Since *Erie,* the sovereignty of any federal court has been changeable. As to a claim created by federal law, the court remains subject only to the sovereignty of the United States. When a federal court hears a claim based on state law, the court acts under the sovereignty of the state where the court sits.[4] In *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), the plaintiff sought to enforce in a New York federal court a claim under New York negotiable-instruments law that was barred from the New York state courts by the statute of limitations. In his opinion for the Court, Mr. Justice Frankfurter wrote:

> Here we are dealing with a right to recover derived not from the United States but from one of the States. When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the right may at times, naturally enough, vary because the two judicial systems are not identic. But since *a federal court adjudicating a State-created right* solely because of the diversity of citizenship of the parties *is for that purpose, in effect, only another court of the State,* it cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State.

*Id.* at 108, 65 S.Ct. at 1469 (emphasis added).

This principle of sovereignty is preserved today in the doctrine of *in personam* jurisdiction. In theory, no person can be made subject to the jurisdiction of any state against his will or by the mere status of citizenship in the United States. Rather, he subjects himself to a state's jurisdiction through his own affirmative acts. Each state's "long-arm" statute sets out, within the broad limits of the Due Process Clause of the Fourteenth Amendment, what "certain minimum contacts" with that state a person must have in order to make himself a potential defendant in that state's courts. *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The decision of the Virginia legislature to close the doors of its courts to medical-malpractice plaintiffs, unless they notify the defendant before filing suit and give the defendant a chance to have a medical review panel convened, must also close the doors to the federal courts sitting in Virginia, because for that purpose they are both courts of the same sovereign, the Commonwealth of Virginia, and exercise the same personal jurisdiction. Note 4, *supra.*

■ The courts of West Virginia, on other hand, are never under the sovereignty of the Commonwealth of Virginia. A defendant in a West Virginia state court, over whom this state has personal jurisdiction, is subject to the sovereignty of this state.[5] This state may choose, under principles of comity and the broad limits of the U.S. *Constitution,* to apply in its courts the substantive law of another jurisdiction, in accord with this state's choice-of-law rules. Another state may deny plaintiffs access to its own courts, but may not by that act deny access to the courts of West Virginia. When there is a living cause of action (even though itself a creature of Virginia law),

---

**4.** It is significant that the *in personam* jurisdiction of a federal court, in diversity cases, is co-extensive with the long-arm statute of the forum state. *Arrowsmith v. United Press International,* 320 F.2d 219 (2d Cir.1963); *accord, Omni Capital International v. Rudolf Wolff & Co.,* 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987).

**5.** Of course, the Supremacy Clause of the U.S. *Constitution* requires that, for a federal claim brought in the state courts, the effective sovereign is the United States.

venue is proper in a West Virginia state court, and West Virginia has personal jurisdiction over the defendant, the plaintiff may bring his claim before the state courts of West Virginia and be heard.

## II

Access to the courts marks a special connection among choice-of-law rules, sovereignty, and *in personam* jurisdiction. If, for example, one state explicitly changes the standard of care in tort cases, normal choice-of-law rules dictate that the new standard will be applied when a case from that state is brought in another state's courts. In that case, the state has effectively changed the *quality* of the claim. On the other hand, a state may attempt to change the average and aggregate value of tort judgments by making plaintiffs bring their claims in a particular way. That is what Virginia has done here. We have no doubt that medical review panels were intended by the Virginia legislature to work a substantial change in the outcomes of malpractice cases in general. But the Virginia rule works no change in the choice-of-law analysis. Rather, if applied in the courts of sister states, it would effectively change the *in personam* jurisdiction of other states. This point is well illustrated in the federal courts' treatment of state "door-closing" statutes before and after *Erie*, discussed above.

■ If a defendant has subjected himself to suit in West Virginia under this state's long-arm statute,[6] and the plaintiff is a resident of West Virginia, we refuse to require the plaintiff to litigate his tort claim first before any tribunal in another state. On the other hand, in consideration of our own public policy and principles of comity, we would not permit Virginia citizens with few contacts in this state to sue Virginia "health care providers" here simply to avoid the review panel procedures required in the Commonwealth of Virginia.

Experience instructs us that in American liability law—particularly in the areas of medical malpractice, product liability, and illegal firing—there are hidden costs that reported judgments and settlements do not entirely reflect. In malpractice, some of these costs involve unnecessary medical procedures used exclusively to reduce malpractice exposure; in product liability, the chilling effect on product innovation in the United States and the movement of product development to offshore factories and markets; and, in firing cases, the disutility of retaining inefficient or obstreperous workers. Therefore, to the extent that the states are laboratories for social experimentation, efforts to discover fairer, cheaper, and more acceptable alternatives to traditional litigation should be applauded. Our decision here may short-circuit a valuable social experiment in Virginia, and we do not take lightly that possibility.[7]

This case might come out differently if the Virginia scheme differed in some specifics—for example, a straightforward change in the standard of care, panel representation from a plaintiff's home state, a simpler arbitration process, or a process that plaintiffs themselves might *want* to go through. The basic principle in this case is that a state can control access only to its own courts. Nonetheless, the particulars of another state's alternatives to the traditional civil trial are bound to influence this Court's decision to defer to that process or not. Virginia's medical malpractice review process, we conclude, is so complicated and expensive that, once it was in motion, a plaintiff would have little choice but to remain in the Virginia courts.

For the reasons set out above, we reverse the judgment of the Circuit Court of Raleigh County and remand the case for

---

6. *W.Va.Code,* 56-3-33 [1984].

7. "To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co., v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386–87, 75 L.Ed. 747 (1932) (Brandeis, J., dissenting).

further proceedings consistent with this opinion.

Reversed and Remanded.

BROTHERTON, C.J., dissents and reserves the right to file a dissenting opinion.

BROTHERTON, Chief Justice, dissenting:

I must dissent in this case because I disagree with the majority's foray into "creative jurisdiction." I do not quibble with the majority's rather blithe assumption of the existence of West Virginia's personal jurisdiction over the defendant Virginia hospital, since the defendant is licensed to do business in West Virginia. What I do object to is the majority's farcical treatment of Virginia's substantive law.

The majority admits that West Virginia adheres to the *lex loci delicti* theory of conflicts of law, thus applying the substantive law of the state where the injury took place. *Paul v. National Life*, 177 W.Va. 427, 352 S.E.2d 550 (1986). It is undisputed that the alleged injury took place in Radford, Virginia. It is also undisputed that the Fourth Circuit Court of Appeals has held that the Virginia statute requiring a medical review panel be convened to review medical malpractice suits is the *substantive* law of that state.[1] *DiAntonio v. Northampton–Accomack Memorial Hospital*, 628 F.2d 287, 290 (4th Cir.1980).[2] Consequently, the majority's decision to "part ways" with the Fourth Circuit's finding in *DiAntonio* is nothing short of blatant protectionism of West Virginia residents in direct contravention of the *lex loci delicti* theory of conflicts of law.

The majority cites "sovereignty, *in personam* jurisdiction and access to the courts of sister states" as the basis for their holding. While we allow that these are important principles, they should be mere factors in the ultimate decision rather than the primary reason for ignoring the substantive law of Virginia.

The leading case, *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny changed the face of multi-state suits to allow, for example, a West Virginia plaintiff to file suit in West Virginia against a Virginia defendant, without having to travel to Virginia, if it could be shown that the Virginia defendant had "certain minimum contacts" with West Virginia. That right, however, cannot be extended to ignore the law of the state where the injury occurred.

The question is not controlling "access to the courts of sister states," as the majority so coyly phrases the issue. It is a question of maintaining the integrity and predictability of the internal laws of the sister state as well as avoiding the dreaded specter of "forum shopping" to obtain the most favorable law. In this case, the plaintiff *voluntarily* availed himself of the benefits of the Commonwealth of Virginia, much as if he was involved in an automobile accident on Virginia roads. It is not only fitting, but legally correct, that he be subjected to the substantive law of the state where the injury occurred.

I would point out the majority's words in *Paul:* "we have long recognized that comity does not require the application of the substantive law of a foreign state when the law contravenes the public policy of this State." 177 W.Va. at 433, 352 S.E.2d at 556. Yet at no point in the *Vest* opinion does the majority actually find that the Virginia statute contravenes any public policy of this State. Their actions, however, do just that. Could it be that the contravened public policy is any law belonging to a foreign state that would affect the rights of a West Virginian to sue an entity in that foreign state? If that is so, then the ma-

---

**1.** The majority admits, 182 W.Va. at page 230, 387 S.E.2d at page 284, that "[w]e do not in the least disagree with the holding in *DiAntonio.*"

**2.** "The Act's notice requirement and *provision for panel review* at the instance of either party were so 'intimately bound up' with the rights and obligations being asserted as to require their application in federal courts under the doctrine of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)." (Emphasis added.) *DiAntonio v. Northampton–Accomack Memorial Hospital*, 628 F.2d at 290.

jority has surreptitiously, but effectively, abrogated our adherence to the *lex loci delicti* theory of conflicts of law so steadfastly affirmed in *Paul.*

I can only speculate that if the situation was reversed, and a Virginia court ignored a similar statute in our State, the majority would be appalled at the disregard for comity between two sister states. In this case, however, the majority essentially proclaims: All ye citizens of this great State who stray from the friendly confines of its boundaries and are injured in a foreign state, return home, cast out your nets, and if in the casting, the net reaches far enough to snare the corporate defendant that caused the injury, reel in the net and we will give to you "the most favored citizen" interpretation of our substantive law. Foreign defendants will know to beware of causing harm to our citizens![3]

For the above reasons, I respectfully dissent.

---

**3.** Similar sentiments were expressed in *Paul* and *Perkins v. Doe,* 177 W.Va. 84, 350 S.E.2d 711 (1986).